COURT OF APPEALS
DECISION
DATED AND FILED

June 8, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* Wis. Stat. § 808.10 and Rule 809.62.

Appeal No.    **2020AP332**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017FA143

**IN COURT OF APPEALS
DISTRICT III**

---

IN RE THE MARRIAGE OF:

SHANNEN ELIZABETH RICHARD P/K/A SHANNEN ELIZABETH RASMUSSEN,

PETITIONER-APPELLANT,

V.

MARK JOSEPH RASMUSSEN,

RESPONDENT-RESPONDENT.

---

APPEAL from a judgment and an order of the circuit court for Shawano County:  WILLIAM F. KUSSEL, JR., Judge.  *Judgment reversed in part; order reversed and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ

¶1    STARK, P.J.   Shannen Richard appeals a judgment of divorce and a subsequent order addressing her motion to clarify the circuit court's decision

regarding maintenance. Shannen argues the court erred when it adopted the proposed divorce judgment submitted by her former husband, Mark Rasmussen,[1] which applied a 22.5% discount for possible future tax liability to the values of the parties' retirement accounts. Shannen contends that, contrary to Mark's assertion, she never stipulated to the application of a 22.5% tax discount, and the record does not support applying a discount in that amount. Shannen also argues the court erred by denying her a long-term maintenance award and instead ordering Mark to pay the entirety of the health insurance premiums for the parties' two teenage daughters in lieu of maintenance.

¶2     We agree with Shannen that the circuit court erred by adopting Mark's proposed judgment, to the extent it applied a 22.5% tax discount to the values of the parties' retirement accounts. We also agree with Shannen that the court erroneously exercised its discretion by ordering Mark to pay the children's health insurance premiums in lieu of maintenance—which effectively denied Shannen a long-term maintenance award—without adequately explaining the basis for its decision in that regard.

¶3     We therefore reverse those portions of the divorce judgment dividing the parties' property and ordering Mark to pay the children's health insurance premiums in lieu of maintenance, as well as the entirety of the order addressing Shannen's motion to clarify maintenance. We remand for the circuit court to: (1) determine whether a reduction in the values of the parties' retirement accounts for potential future tax liability is appropriate under the circumstances of

---

[1] For ease of reading, and following the parties' lead, we refer to the parties by their first names throughout the remainder of this opinion.

this case and, if so, in what amount, and to modify the parties' property division accordingly; and (2) reconsider the issue of maintenance.

## BACKGROUND

¶4 The parties were married in September 1999. Shannen petitioned for divorce in November 2017, and a contested divorce hearing took place on July 16, 2019. At the time of the hearing, the parties had two minor daughters, ages sixteen and fourteen.

¶5 Both Shannen and Mark have associate's degrees, and they were both in good health at the time of the contested hearing. Shannen was forty-four years old, and Mark was forty-six. During the marriage, Shannen spent thirteen years out of the workforce while she stayed home to care for the parties' children. At the time of the hearing, Shannen was employed full-time as an engineered wood products designer. Shannen reported that her gross income from that employment was about $39,500 per year.

¶6 On cross-examination, Shannen conceded that she also worked about two to five hours of overtime per week at 1.5 times her normal hourly rate. Her reported annual income of $39,500 did not include that overtime income. Shannen also conceded on cross-examination that between April 2018 and April 2019, she had earned about $7,500 from her own residential design business. She testified, however, that she stopped earning income from that business after she began working full-time for her current employer.

¶7 Mark testified at the contested hearing that he was employed as a systems specialist, earning about $88,000 per year. During the previous three

years, his annual income had been between $74,000 and $79,000. He anticipated, however, that his annual income would remain at about $88,000 going forward.

¶8    The parties disagreed as to the amount of maintenance the circuit court should award to Shannen. Shannen's calculations showed that maintenance payments to her of $580 per month would equalize the parties' income, after child support was paid. Mark's calculations showed that monthly maintenance payments to Shannen of $160 would provide him with 55% of the parties' income and Shannen with 45%, after child support was paid. Mark later argued that, taking into account Shannen's additional income from her unreported overtime, his maintenance obligation should be only $144 per month. Mark proposed that, rather than requiring him to pay Shannen $144 in maintenance each month, the court should instead make him responsible for paying the full amount of the children's health insurance premiums—or $220 per month—rather than half of that amount. In other words, under Mark's proposal, instead of making monthly maintenance payments to Shannen, he would be required to pay an additional $110 toward the children's health insurance premiums each month, which Shannen would have otherwise been required to pay.

¶9    With respect to the property division, following a recess in the contested hearing, Mark's attorney informed the circuit court that she and Shannen's attorney "did go through both of our property balance sheets and I think we're able to take some of the discrepancies out of them." The attorneys then described the aspects of the property division upon which the parties had agreed. As relevant to this appeal, Mark's attorney stated, "[M]y client's retirement savings plan is actually up about $3,000 so I actually included that in my running numbers here so that is taken care of. I believe it's about $112,333 so that is

adjusted on my program now too." Neither attorney told the court that the parties had reached any other agreement with respect to their retirement accounts.

¶10 After the parties' attorneys described their stipulation for the circuit court, the following exchange occurred:

> [Mark's attorney:] All right. Mark so you heard that basically it's not going to be a whole lot of difference in our numbers, we basically massaged up and down on those numbers, are you okay with what's going on here?
>
> [Mark:] I am.
>
> [Shannen's attorney:] And likewise [Shannen], do you understand what we're doing?
>
> [Shannen:] Yes.
>
> [Shannen's attorney:] Are you in agreement?
>
> [Shannen:] Yes.

¶11 Earlier during the contested hearing, Shannen had testified on both direct and cross-examination regarding the values of various accounts and items of property. With respect to the parties' retirement accounts, Shannen's attorney asked her, "You've got a small 401K at … your new employe[r], you'd ask to be awarded that?" Shannen responded in the affirmative. Her attorney then asked, "Your husband has about $112,000 in his 401K and that's either going to be that or perhaps his Elite Choice IRA is probably going to go over to you, do you understand that just to equalize so no one has to go out and get a great big loan?" Again, Shannen responded in the affirmative. The $112,000 figure that Shannen's attorney mentioned was the full value of Mark's 401K, without any discount for potential future tax liability.

¶12      Mark's attorney also questioned Shannen regarding the retirement accounts as follows:

> [Mark's attorney:] Okay. You have—I think your—your attorney indicated to you that as part of the division of retirement plans you understand that you will be keeping your minimal retirement plan correct?
>
> [Shannen:] My retirement plan through my employer?
>
> [Mark's attorney:] Yes.
>
> [Shannen:] Yes.
>
> [Mark's attorney:] Okay. My client has two other retirement plans and although your attorney had set forth both of them in my client's column he did indicate during testimony that you would most likely be receiving at least the $30,000 IRA as part of your retirement in this divorce, correct?
>
> [Shannen:] Yes.

¶13      The circuit court made an oral ruling at the end of the contested hearing.[2] With respect to the property division, the court stated, "I understand it seems to me that—that the property division is pretty much stipulated to." The court then addressed two items of property that remained disputed: a tractor and a wood splitter. The court did not specifically discuss any other aspect of the property division during its oral ruling.

---

[2] In addition to property division and maintenance, the circuit court also addressed legal custody, physical placement, and child support. As Shannen does not raise any arguments regarding those issues on appeal, we do not address them further.

¶14 As for maintenance, after mentioning most of the factors listed in WIS. STAT. § 767.56(1c) (2019-20),[3] the circuit court stated:

> I think it's—it's really justified that the support should be $144.00 per month on this matter under the balance sheet the way it worked—not balance sheet but under the tax calc—maintenance I'm sorry.
>
> ….
>
> So the question comes the proposal would be that the husband would in lieu of maintenance pay the entire amount of the health insurance payments for the children which is actually—and I think that that is—makes a very good recommendation and I'm going to adopt that.
>
> That way we have—that way the children—we know the children are taken care of through that. Mother has I think well sufficient money to support under the lifestyle she was used to when she was married.

¶15 Shannen's attorney filed a "Proposed Findings of Fact, Conclusions of Law and Judgment of Divorce" on September 3, 2019. The proposed judgment reflected a 50/50 property division, with Shannen receiving an equalization payment of $41,370.55 from Mark. The court signed the proposed judgment on October 7, 2019. The following day, Mark's attorney moved to vacate the judgment, asserting revisions were necessary because the judgment "did not reflect the Orders of this Court." On October 17, 2019, the court entered an order vacating the judgment.

¶16 Shannen subsequently retained new counsel. Mark's attorney then filed a "Proposed Findings of Fact, Conclusions of Law and Judgment of Divorce"

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

on December 9, 2019. With respect to maintenance, Mark's proposed judgment provided:

> No maintenance payments are awarded to [Mark], but [Mark] shall pay the sum of $144.00 per month as maintenance payments for the support and maintenance of [Shannen]. However, in lieu of payment to [Shannen], [Mark] shall pay the entirety of the cost of the health insurance premium for the minor children.

Mark's proposed judgment reflected a 50/50 property division, with Shannen receiving an equalization payment of $34,966.44. In reaching that number, Mark's proposed judgment applied a 22.5% discount to the values of the parties' retirement accounts based on potential future tax liability.

¶17 Shannen objected to Mark's proposed judgment, asserting that applying a tax discount to the values of the parties' retirement accounts was speculative and that Shannen was not "advised by counsel regarding the ramifications of the [discount] nor did she agree to the same on the record." The circuit court rejected Shannen's objection and signed Mark's proposed judgment on January 8, 2020. Shannen then filed a notice of appeal from the January 8 judgment.

¶18 Thereafter, on May 12, 2020, Shannen filed a motion to modify maintenance. As grounds for that motion, Shannen asserted that her employment had been permanently terminated in May 2020 as a result of the COVID-19 pandemic. Mark opposed Shannen's motion, asserting:

> [P]ursuant to our Judgment of … Divorce, I believe maintenance was closed and same was not awarded to [Shannen] by the Court. This was done as the maintenance award to [Shannen] would have been similar to the deviation[] I would have received for providing health insurance coverage for the children. Therefore, no maintenance was awarded, and no contribution to health

8

insurance from [Shannen] was awarded. I do not believe maintenance should be revisited or re-opened by this Court.

¶19     Shannen later withdrew her motion to modify maintenance, noting that she had begun receiving unemployment compensation and, accordingly, her motion was "no longer viable." Shannen asserted, however, that Mark's response to her motion had "raised a question of law as to [Shannen's] legal entitlement to ever seek a modification of maintenance at any juncture regardless of any change in factual circumstances." Shannen therefore asked the court to clarify "the intended legal effect of [its] rulings regarding maintenance at the time of trial."

¶20     On July 10, 2020, the circuit court entered a written order addressing Shannen's motion to clarify maintenance. The court concluded it had ordered Mark to pay the children's health insurance premiums "in lieu of"—meaning "instead of"—maintenance. The court therefore stated that "[n]o maintenance was ordered for either party," and, as such, maintenance was "closed to both parties." Shannen filed a second notice of appeal from the court's July 10 order, which we construed as an additional notice of appeal in the existing matter.

## DISCUSSION

### I. Standard of review

¶21     The division of property and the determination of maintenance at divorce are within the circuit court's discretion, and we will not disturb the court's determinations unless the court erroneously exercised its discretion.[4]  *LeMere v.*

---

[4] Shannen repeatedly uses the phrase "abuse of discretion." Our supreme court changed the terminology used in reviewing a circuit court's discretionary decisions from "abuse of discretion" to "erroneous exercise of discretion" in 1992. *See State v. Plymesser*, 172 Wis. 2d 583, 585 n.1, 493 N.W.2d 367 (1992).

*LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789. "A circuit court erroneously exercises its discretion if it makes an error of law or neglects to base its decision upon facts in the record." *Id.*, ¶14 (citation omitted). Conversely, we will uphold a circuit court's discretionary decision as long as the court examined the relevant facts, applied a proper standard of law, and used a demonstrated rational process to reach a reasonable conclusion. *Id.*, ¶13.

¶22 Our review of a circuit court's discretionary decisions may involve underlying questions of law and fact. *See Covelli v. Covelli*, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260. We review any questions of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous. *See id.*

## II. Property division

¶23 On appeal, Shannen first argues that the circuit court erroneously exercised its discretion by adopting—over her objection—the property division set forth in Mark's proposed divorce judgment, which provided for a 22.5% reduction in the values of the parties' retirement accounts based on potential future tax liability. Shannen contends that the court should have made a determination as to the appropriateness of that tax discount, which substantially favored Mark and was speculative at best. Shannen further argues that the court never received any evidence to support a reduction based on future tax consequences, and she contends there is no evidence in the record that she knowingly agreed to such a reduction. Shannen specifically notes that the only value for Mark's larger retirement account that was stated on the record during the contested hearing was its full value of $112,333, without any reduction for future taxes. Under these circumstances, Shannen contends the court erred by adopting the parties'

"stipulation" regarding the retirement accounts, as the court failed in its duty to ensure that the parties understood the stipulation and were fully informed of its effects.

¶24    In support of her argument, Shannen relies on *Conrad v. Conrad*, 92 Wis. 2d 407, 284 N.W.2d 674 (1979). In that case, the wife's attorney informed the court during a hearing that the parties had stipulated the husband would pay the wife $43,750 as part of their property division. *Id.* at 409. The court adopted the parties' stipulation and ordered the husband to pay the wife that amount. *Id.* at 410. At the close of the hearing, the husband's attorney stated the record should reflect that both parties were in court, and that they had heard and agreed to the stipulation. *Id.*

¶25    The wife's attorney subsequently filed a proposed judgment that allowed the husband to subtract $5,442 from the amount he had agreed to pay the wife, in order to account for money in accounts that were titled solely in the wife's name. *Id.* at 410-11. The wife then objected to the proposed judgment, arguing, in part, that "her attorney had told her [the total value of the marital estate] was $90,000, while the figures used in the proposed findings and judgment indicate[d] a total value of $124,167.69." *Id.* at 411. The circuit court signed the proposed judgment over the wife's objection. *Id.* at 412. The wife then retained new counsel and filed a motion to reopen the divorce judgment, arguing that "her agreement to the stipulation was obtained under duress and was coerced and not wholly knowing and voluntary." *Id.* The court denied her motion without a hearing. *Id.*

¶26    On appeal, our supreme court concluded the circuit court had erroneously exercised its discretion by denying the wife's motion to reopen the

divorce judgment. *Id.* at 414-15. The court stated the record did not show "that the wife ever specifically agreed to the oral property division stipulation her trial counsel entered on the record on her behalf." *Id.* at 415. Instead, the record merely contained "a statement by the husband's attorney that the parties were in court and agreed to such stipulation. The wife, however, was never specifically asked on the record whether she did in fact agree or understand what was being stipulated." *Id.*

¶27    The *Conrad* court then quoted the following language from *Miner v. Miner*, 10 Wis. 2d 438, 103 N.W.2d 4 (1960):

> The (trial) court has the same serious duty to examine carefully such agreements or stipulations against the background of full information of the economic status and resources of the parties as it has in making a determination without the aid of such an agreement. The parties should be examined to determine if they understand the provisions and the effect of the agreement, that it was fairly and voluntarily entered into and was not made with any concessions by either party that the suit would be uncontested. There is no such thing in this state as a divorce by consent or agreement. The parties cannot by stipulation subscribe, modify, or oust the court of its power to determine the disposition of property, alimony, support, custody, or other matters involved in a divorce proceeding. When a court follows and adopts an agreement of the parties making it a part of its judgment, the court does so on its own responsibility, and the provisions become its own judgment.

*Conrad*, 92 Wis. 2d at 415-16 (quoting *Miner*, 10 Wis. 2d at 443). Applying the standard set forth in *Miner*, the *Conrad* court determined the circuit court had failed in its obligation to ensure, on the record, that the wife understood and agreed to the parties' stipulation regarding the property division. *Id.* at 416.

¶28    We agree with Shannen that the circuit court here failed in its duty under *Conrad* to ensure that she understood and agreed to the parties' stipulation

12

as it pertained to the tax discount applied to their retirement accounts. The transcript of the contested hearing shows that the parties' attorneys described their property division stipulation on the record. Shannen's attorney then asked whether Shannen understood "what we're doing" and whether she was "in agreement," and Shannen responded "Yes" to both of those questions. The attorneys' on-the-record description of the stipulation, however, did not include any reference to applying a tax discount—in any amount—to the parties' retirement accounts.

¶29 In fact, the only reference to the retirement accounts during the attorneys' recitation of the stipulation was Mark's attorney's statement that the value of one of Mark's accounts had increased to "about $112,333," which was the full value of that account without any tax discount. At no other point during the contested hearing did Shannen indicate that she understood or agreed that a tax discount would be applied to the parties' retirement accounts. On this record, we cannot conclude that the circuit court fulfilled its duty under *Conrad* to ensure that Shannen understood and agreed to the application of a 22.5% tax discount.

¶30 Moreover, as Shannen correctly notes, absent a valid stipulation to apply a 22.5% tax discount, there was no evidence in the record that would have supported applying a discount in that amount. There was no expert testimony at trial as to whether it was appropriate to apply a tax discount to the parties' retirement accounts and, if so, in what amount. There is also nothing in the record to indicate that the circuit court considered the appropriateness of applying a 22.5% tax discount, beyond the court's apparent conclusion that the parties had stipulated to a discount in that amount. Under these circumstances, we conclude the court erroneously exercised its discretion by adopting the 22.5% tax discount over Shannen's objection. Although we may search the record for reasons to

sustain a circuit court's discretionary decision, *see* **Randall v. Randall**, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737, in this case, there is nothing in the record to support the court's application of a 22.5% tax discount to the parties' retirement accounts.

¶31    In arguing to the contrary, Mark asserts that Shannen should be foreclosed from objecting to the 22.5% tax discount because the financial disclosure statement that she submitted at the contested hearing reflected the application of 20% tax discount to the parties' retirement accounts.  Mark notes that by signing the financial disclosure statement, Shannen "declare[d] under penalty of perjury" that the representations therein were "true and correct."  Mark further notes that, during Shannen's cross-examination, his attorney referred to one of his retirement accounts as having a value of $30,000 and stated Shannen would most likely receive that account in the property division.  Mark observes that the $30,000 value for that account was taken from Shannen's financial disclosure statement and reflected a 20% tax discount.  Mark contends this evidence shows that Shannen was aware of, and agreed to, the application of a tax discount to the parties' retirement accounts.

¶32    Mark is correct that Shannen's financial disclosure statement proposed a 20% tax discount, and that Mark's attorney mentioned the $30,000 value of one of Mark's accounts during Shannen's cross-examination.  That evidence is insufficient to show, however, that Shannen ultimately stipulated to applying a 22.5% tax discount to the parties' retirement accounts.  Again, when the parties' attorneys described their stipulation on the record for the circuit court, they made no mention of any agreement regarding the retirement accounts, aside from Mark's attorney's statement that one of Mark's accounts had a value of

$112,333—which was its value without any tax discount. On this record, we cannot conclude Shannen agreed to the application of a 22.5% discount.

¶33    Mark also argues that the 22.5% discount was the result of an agreement between the parties' attorneys. During the hearing on Shannen's objection to Mark's proposed judgment, Mark's attorney asserted that she and Shannen's first attorney had agreed to apply a 22.5% discount to "split the difference" between Shannen's proposed 20% discount and Mark's proposed 25% discount. Mark's attorney did not, however, testify under oath to the existence of such an agreement. Moreover, Mark points to nothing in the record indicating that Shannen—as opposed to her attorney—agreed to the imposition of a 22.5% discount, or that Shannen was aware of any agreement between the parties' attorneys to apply a discount in that amount.

¶34    Finally, Mark suggests that *Conrad* is no longer good law because it was subsequently distinguished by *Hottenroth v. Hetsko*, 2006 WI App 249, 298 Wis. 2d 200, 727 N.W.2d 38. However, the *Hottenroth* court's determination that *Conrad* was factually distinguishable does not mean *Conrad* is no longer good law. The *Hottenroth* court concluded *Conrad* was distinguishable because, unlike in *Conrad*, the circuit court in *Hottenroth* "did inquire into the parties' understanding of and agreement to each stipulation before it approved each, and Hottenroth did not object to the stipulations until four months later." *Hottenroth*, 298 Wis. 2d 200, ¶37. The circuit court then held a two-day evidentiary hearing on Hottenroth's motions for relief from judgment and reconsideration and provided a thorough oral decision explaining its denial of those motions. *Id.*

¶35    Conversely, in this case, the circuit court did not inquire into the parties' understanding of, and agreement to, any stipulation regarding the

15

application of a tax discount to the parties' retirement accounts at the final divorce hearing. Moreover, after Mark submitted a proposed judgment including a 22.5% tax discount, Shannen's new attorney promptly informed the court by letter that Shannen objected to the proposed judgment and that counsel was attempting to obtain a transcript of the contested hearing in order to prepare a formal objection. Shannen filed a formal objection to the proposed judgment less than one month later, and the court subsequently denied her objection without holding an evidentiary hearing. On these facts, we agree with Shannen that this case is more similar to *Conrad* than to *Hottenroth*.

¶36 For all the foregoing reasons, we conclude the circuit court erroneously exercised its discretion by adopting Mark's proposed judgment over Shannen's objection, to the extent the judgment applied a 22.5% tax discount to the values of the parties' retirement accounts. We therefore reverse and remand for the court to conduct further proceedings in order to determine whether a reduction in the values of the parties' retirement accounts for potential future tax liability is appropriate under the circumstances of this case and, if so, in what amount, and to modify the property division accordingly.

### III. Maintenance

¶37 Shannen also argues that the circuit court erred with respect to maintenance. As noted above, the divorce judgment stated that Mark "shall pay the sum of $144.00 per month as maintenance payments for the support and maintenance of" Shannen. However, the judgment then stated that Mark would pay the entirety of the children's health insurance premiums "in lieu of payment" to Shannen. In response to Shannen's motion to clarify maintenance, the court stated it had ordered Mark to pay the children's health insurance premiums

"instead of" maintenance, and, as such, "[n]o maintenance was ordered for either party" and "maintenance is closed to both parties."

¶38    Shannen contends the circuit court's decision in this regard was erroneous because the court determined during the contested hearing that she was entitled to maintenance in the amount of $144 per month without addressing the appropriate duration of the maintenance award. Shannen asserts that the court's subsequent decision on her motion to clarify maintenance essentially limited Mark's future payment obligation to twenty-eight months—the length of time Mark was required to continue paying the children's health insurance premiums after the date of the court's decision.[5] Shannen argues the court failed to articulate any reasonable basis for limiting her entitlement to maintenance to twenty-eight months, or for construing Mark's payment obligation as something other than maintenance, thereby taking away her ability to seek a modification of maintenance in the future. In response, Mark contends that the court considered all of the relevant statutory factors when determining maintenance and that its findings support its decision to require Mark to pay the entirety of the children's health insurance premiums in lieu of maintenance.

¶39    We agree with Shannen that the circuit court erroneously exercised its discretion by ordering Mark to pay the children's health insurance premiums in lieu of maintenance—which effectively denied Shannen a long-term maintenance award—without adequately explaining the basis for that decision. Critically, the

---

[5] Shannen asserts that Mark's obligation to pay the children's health premiums will end when their younger daughter turns eighteen in November 2022, which is twenty-eight months after the circuit court issued its decision on Shannen's motion to clarify maintenance. Mark does not dispute that his obligation to pay the premiums will end when the parties' younger daughter turns eighteen.

court never concluded that Shannen was not entitled to maintenance. Rather, during its oral ruling at the close of the contested hearing, the court clearly determined that Shannen was entitled to maintenance in the amount of $144 per month. The court did not address the appropriate duration of maintenance during its oral ruling. Instead, the court concluded—apparently as a matter of administrative convenience—that Mark would be required to pay the entirety of the children's health insurance premiums rather than making maintenance payments directly to Shannen.

¶40 There are at least two problems with the circuit court's decision in this regard. First, the court failed to explain why it believed it was appropriate to limit Mark's payment obligation to the length of time he would be required to pay the children's health insurance premiums—which was forty months as of the time of the contested hearing. This was a long-term marriage. At the time of the contested hearing, the parties had been married for nearly twenty years. Moreover, the evidence showed that during the marriage, Shannen left the workforce for thirteen years in order to stay home and care for the parties' children. In addition, Mark's income was significantly higher than Shannen's. The court did not explain why, under these circumstances, it was appropriate to order Mark to pay the children's health insurance premiums for the limited term of forty months, rather than requiring him to pay Shannen maintenance for a longer period.

¶41 Second, although the circuit court concluded Shannen was entitled to $144 per month in maintenance, by ordering Mark to pay the entirety of the children's health insurance premiums instead, the court actually required him to pay a lesser amount. At the time of the contested hearing, the total monthly health insurance premium for both children was $220. Mark's attorney conceded at the

hearing that each party would normally be responsible for one-half of that amount, or $110 per month. Thus, by ordering Mark to pay the entirety of the health insurance premiums, the court ordered him to pay an additional $110 per month, beyond what he would already have been required to pay. The court did not explain why it was appropriate to impose a $110 monthly payment obligation on Mark in lieu of the $144 monthly maintenance payments to which the court had already determined Shannen was entitled. Moreover, the court apparently failed to consider that a decrease in the amount of the health insurance premium might occur when the parties' older daughter turned eighteen and/or graduated from high school.

¶42    A review of the circuit court's findings reveals no clear justification for the court's decision to limit Mark's payment obligation to $110 per month for the forty months during which he was required to pay the children's health insurance premiums. The court acknowledged that the parties had a "fairly long marriage." *See* WIS. STAT. § 767.56(1c)(a). Given the length of the parties' marriage, however, the court did not explain how its order that Mark pay the entirety of the children's health insurance premiums for forty months was an appropriate substitute for a maintenance award of potentially longer duration.

¶43    "The starting point for a maintenance evaluation following a long-term marriage is to award the dependent spouse half of the total combined earnings of both parties." *Schmitt v. Schmitt*, 2001 WI App 78, ¶13, 242 Wis. 2d 565, 626 N.W.2d 14. Here, Mark proposed a monthly maintenance award of $144, which he asserted would provide him with 55% of the parties' income and Shannen with 45%, after child support was paid. The court did not explain why it adopted Mark's proposed unequal division of the parties' income rather than ordering an equal division of the total combined earnings of both parties.

19

Moreover, the court's actual award of $110 per month deviated even further from an equal division, absent any cogent explanation from the court regarding the appropriateness of that deviation. In addition, Mark's maintenance calculation took into account the fact that he would be required to pay Shannen child support until the parties' younger daughter turned eighteen. When addressing maintenance, the court did not consider the fact that Mark's child support obligation would end forty months after the contested hearing.

¶44 The circuit court noted that one of the goals of maintenance is to "have people maintain the standard of living they had while they were married." *See* WIS. STAT. § 767.56(1c)(f). The court did not, however, discuss the parties' standard of living during the marriage or explain how its decision regarding maintenance served the goal of maintaining that standard. The court later stated that its decision provided Shannen with "sufficient money to support … the lifestyle she was used to when she was married," but it did not cite any evidence in support of that finding, nor did it describe the lifestyle to which Shannen was accustomed.

¶45 The circuit court next observed that the parties had a "traditional marriage," in that Mark worked throughout the marriage, while Shannen left the workforce for a significant amount of time to care for the parties' children. Nevertheless, the court did not give significant weight to that factor because Shannen was, at the time of the contested hearing, "working according to her Associate degree." The court did not consider how Shannen's absence from the workforce during the marriage may have negatively affected her earning capacity, nor did it address how that absence may have contributed to an increase in Mark's earning capacity. *See* WIS. STAT. § 767.56(1c)(e), (i). The court noted that both parties were in good health and able to work, *see* § 767.56(1c)(b), but those facts

do not erase the potential impact of Shannen's lengthy absence from the workforce.

¶46 The circuit court then addressed the parties' expenses and found that, while Mark's expenses were "pretty conservative," Shannen's expenses "seem[ed] to be a little high." In total, Shannen reported monthly expenses of $4,525.56, while Mark reported roughly comparable monthly expenses of $4,050. The court did not explain why its belief that Shannen's expenses were "a little high" justified deviating from an equal division of the parties' income, given the other circumstances of the case, or why Shannen's expenses justified limiting Mark's payment obligation to the length of time that he would be required to pay the children's health insurance premiums.

¶47 Next, the circuit court observed that Shannen's maintenance calculations did not include her overtime income or the income she had earned from her residential design business. The court apparently did not consider Shannen's undisputed testimony that she was no longer earning income from her residential design business because she had obtained full-time employment elsewhere. Moreover, Mark's proposed maintenance award of $144 per month already took into account Shannen's additional overtime income. Accordingly, that factor did not support the court's further downward deviation from $144 per month to $110 per month.

¶48 Finally, the circuit court stated that it "[took] into consideration the division of property" when analyzing the issue of maintenance. *See* WIS. STAT. § 767.56(1c)(c). Yet, the court failed to explain how the property division affected its maintenance analysis. It is not apparent why the court's decision to order an equal division of the parties' property would have motivated the court to award

21

maintenance—or payments in lieu of maintenance—that resulted in an unequal division of the parties' total income.

¶49    Ultimately, for all of the reasons explained above, we agree with Shannen that the circuit court erroneously exercised its discretion by ordering Mark to pay the entirety of the children's health insurance premiums in lieu of maintenance.  We therefore reverse that portion of the divorce judgment pertaining to maintenance, as well as the entirety of the order addressing Shannen's motion to clarify maintenance.  We remand for the court to reconsider the amount and duration of an appropriate maintenance award to Shannen.  If the court decides to award maintenance in an amount that results in an unequal division of the parties' income, the court should take care to explain how the relevant statutory factors support that decision.

*By the Court.*—Judgment reversed in part; order reversed and cause remanded with directions.

Not recommended for publication in the official reports.